**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **JENNIFER GUERRERO** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Judge Blanche M. Manning** |
| | ) | **Case No. 05 C 2787** |
| | ) | |
| **THE HARTFORD FINANCIAL** | ) | |
| **SERVICES GROUP; THE NORTHERN** | ) | |
| **TRUST COMPANY EMPLOYEE** | ) | |
| **BENEFIT ADMINISTRATIVE** | ) | |
| **COMMITTEE; and THE NORTHERN** | ) | |
| **TRUST COMPANY EMPLOYEE** | ) | |
| **WELFARE BENEFIT PLAN,** | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Plaintiff Jennifer Guerrero was denied short-term disability benefits by defendant

Hartford Financial Services Group ("Hartford"), claims administrator for defendant The Northern

Trust Company Welfare Benefit Plan ("Plan"). Guerrero filed suit alleging that the

administrator's denial of benefits was unreasonable, arbitrary and capricious, and in violation of

the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et seq. The

parties have cross-moved for summary judgment. For the reasons stated below, the defendants'

motion is granted and the plaintiff's motion is denied.

**I.      Facts**

A.      The Northern Trust STD Plan

The plaintiff worked as a desktop specialist for The Northern Trust Company. She was

eligible to participate in the short-term disability (STD) benefit program, which is part of the

Northern Trust Employee Welfare Benefit Plan. Defendant Hartford administered short-term benefits under the plan. Defendant The Northern Trust Company Employee Benefit Administrative Committee is the plan administrator.

Northern Trust entered into a Disability Plan Claim Administration Service Agreement with CNA Group Life Assurance Company. The service agreement designated CNA Group Life Assurance Company ("CNAGLAC") as claims administrator of the STD benefits portion of the plan. Pursuant to that authority, CNAGLAC was to determine eligibility for benefits and interpret the provisions of the Plan, and was the party responsible for managing appeals and rendering final claim determinations on behalf of the Plan. Hartford replaced CNAGLAC as the claims and appeal administrator when Hartford acquired CNAGLAC. The STD benefits are fully funded from the general assets of The Northern Trust Company and not from the proceeds of any insurance policy.

The plan is described in a summary plan description called "Your Sourcebook: A Guide to Your Welfare Benefits." The sourcebook states that a "'short-term' disability is defined as a physical or mental impairment that totally prevents you from performing the material and substantial duties of your regular occupation." If a clamaint is found eligible for STD benefits, the benefits continue until a clamaint is no longer disabled from work or up to the 90th calendar day of his or her disability, whichever happens first. The sourcebook also states that the claimant's health care provider is required to provide the plan's disability specialist with medical information to substantiate the disability. It goes on to indicate that "[t]his information is required at the onset of the disability, from time to time during extended disabilities, and could include requiring you to submit to an independent medical exam or tests . . . ."

If Hartford denies a claim, an "adverse benefit determination" (ABD) will be sent in a notice to the claimant. The sourcebook provides that "[i]n deciding an appeal of any ABD that is based in whole or in part on a medical judgment, the Appeals Administrator will consult with a health care professional (who is not the same individual consulted in connection with the ABD nor a subordinate of the individual) who has appropriate training and experience in the field of medicine involved in the medical judgment."

            B.     The Plaintiff's Claim

When she provided notice of her STD claim, the plaintiff indicated her last day of work as a desktop specialist was June 24, 2004. Hartford opened a file on June 29, 2004, contacted the plaintiff, and sent her treating physician, Dr. Beverlee Brisbin, a Medical Assessment Tool/Back Pain (MAT) form and request for the plaintiff's records. By July 14, 2004, Hartford had not received a response despite a follow-up call on July 1, 2004. Therefore, Hartford notified the plaintiff that it was suspending the processing of her claim until it received the information it had requested from Dr. Brisbin.

Dr. Brisbin returned the MAT form on July 15, 2004, which indicated that the estimated return to work date was "unknown until re-evaluated on August 9, 2004." Then, on July 21, 2004, Dr. Brisbin faxed Hartford an MRI examination and chart notes documenting one office visit on or around June 21, 2004, and one telephone message left with the plaintiff. A notation made by another individual dated June 30, 2004, states that Dr. Brisbin recommended two physical limitations: that the plaintiff change positions every 30 minutes and not lift more than 10 pounds.

Dr. Brisbin's June 21, 2004, treatment notes indicate, among other things, that the

plaintiff had complaints of low back pain, and had therapy which helped somewhat. Further, the pain she had in her leg had resolved, and she had no numbness, paresthesia, or incontinence. The treatment notes further indicate that the plaintiff tried various anti-inflammatory medications with limited relief, and that the pain was usually worse when sitting or standing for prolonged periods of time. These notes also indicated that the plaintiff works out on a regular basis and that the plaintiff's weightlifting and elliptical training aggravated her symptoms.[1]

Further, the notes indicate as follows: no fever or chills; no prior history of injury; walked with a normal gait; was able to heel and toe walk without difficulty; no focal tenderness of the cervical, thoracic and lumbosacral spine; no tenderness over the greater trochanters or sciatic notch; a focal tenderness over the right proximal SI joint area; good range of motion with forward flexion and extension at the hip; lower extremity reflexes 2/4 bilaterally; strength is 5/5; sensation intact except for mild diminished sensation in the right medial ankle area; negative seated and supine straight leg raise test; positive Faber test on the right; able to do a straight leg test without difficulty; and has good rotation of the hip.

Moreover, outside x-rays of the spine showed well-preserved disc height space and normal alignment. An MRI indicated some disc protrusion at the L4-5 level but without foraminal narrowing.

The doctor concluded that the plaintiff had "low back pain, right sacroiliitis, piriformis

---

[1]The defendants include in their statement of fact Hartford's summary of the treatment notes and doctor's opinions as to the plaintiff. However, given that they are somewhat lengthy and many of the notes contain abbreviations and medical terms that are not defined or described, the court will not copy the full text of the notes here as they do not necessarily provide any special insight into the merits of this case. Suffice it to say that Hartford appears to have properly summarized the plaintiff's medical history.

syndrome."  It was further noted that while the plaintiff showed some degenerative disc disease, her exam was "relatively unremarkable except for the sensory discrepancy on the right."  The doctor stated that "her most focal findings seem to be the SI joint," and that before considering epidural injections, she would recommend physical therapy.  The notes further state that the plaintiff could continue with activities as tolerated but she should avoid those that provoke her symptoms.  Finally, the doctor noted that the plaintiff should follow-up in four to five weeks, and if she was not improving, could benefit from epidural injections.

Further, notes by Michelle Class, an employee of Hartford, indicate that the plaintiff told her during a phone conversation that if she was "up" for a couple of hours, she needed to lie down, that she "tries to rest and not sit too much," "lays down mostly," and that it is "[h]ard to find a comfortable spot as leg hurts if in one position too long."  Another Hartford employee's notes indicate that the plaintiff's job as a desktop specialist require her to sit 90% of the time with 10% standing and walking.

On July 27, 2004, Hartford called and left a message for Dr. Brisbin to inquire about the doctor's restrictions that the plaintiff change positions every 30 minutes and not lift more than 10 pounds.  Although it appears that Dr. Brisbin was aware of the plaintiff's position as a computer specialist, which the doctor described in her notes as "predominantly sedentary," there is no indication in the record that Dr. Brisbin was aware of the plaintiff's specific job duties.

When Hartford received no response to the July 27 message, it placed a second call on July 29, 2004.  On August 2, 2004, Dr. Brisbin's office faxed the same records sent on July 21 as well as a letter dated June 23, 2004, stating that the plaintiff should not return to work until the next evaluation on August 9, 2004.  The letter stated that the plaintiff had been diagnosed with

sacroilitis piriformis syndrome but did not indicate specifically why the plaintiff should remain off work.

In the meantime, Hartford contacted the plaintiff's supervisor, Gloria Wilson, who indicated that the job of a desktop specialist requires the plaintiff to be seated at a computer with some standing and walking to a printer. Wilson told Hartford that the plaintiff is able to stand and stretch when needed and can do any lifting of copies and materials "little by little or as she is able." Hartford's notes of its conversation with Wilson also state that she could not give a specific weight of the papers that need to be lifted by desktop specialists, but that it could be thousands of papers. Hartford also spoke with the plaintiff and verified that she reportedly ceased work due to back pain, which she attributed to sitting too long. The plaintiff reported to Hartford that she was attending physical therapy, was doing home exercises and was not "taking any RX." The plaintiff also confirmed with Hartford that in her job as a desktop specialist she was primarily seated but that she had the option to stand when needed.

C.    The Defendants' Denial and Appeal

On August 23, 2004, Hartford advised the plaintiff that her claim for STD benefits had been denied. Among other things, the denial stated that the desktop specialist position required sitting at a desk using a computer with no lifting requirements. The letter also stated: "Although we do not dispute that small disc protrusion with slight compression of thecal sac may cause some occasional discomfort this does not suggest a functional impairment that would prevent you from performing work in a seated position with the ability to stretch as needed for comfort. Also, the restrictions noted by your physician are within the requirements of your job . . ."

On October 1, 2004, Hartford received a letter from the plaintiff dated September 24, 2004, which stated, among other things, that she was in pain from a bulging disc. The letter also stated "As far as Dr. Brisbin's results from tests, I can't explain." The plaintiff stated that she could not stretch at work because stretching required her to be on the floor which she did not believe could be done in business attire. Moreover, the plaintiff stated that she believed her job was hard to perform when she was restricted to lifting 10 pounds, and that her job required lifting copies which were sometimes hundreds or even thousands of pages as well as lifting boxes that were half her weight. Further, the plaintiff noted that her job requires her to put boxes of paper on a cart, bring the cart to the print room, and unload the reams on shelving unit. The plaintiff also stated that her back problem made sitting unbearable and walking and climbing stairs more challenging. She also stated that she had frequently been brought to tears due to the severity of the pain. Further, the plaintiff indicated that she had been through physical therapy and had had two epidural injections, which were painful and had not been helpful.

With the September 24, 2004, letter, the plaintiff included: (1) a note from Dr. Brisbin dated August 9, 2004, indicating that the plaintiff was not able to return to work until she was re-evaluated on August 23, 2004; (2) a prescription for physical therapy dated June 21, 2004; (3) pain management discharge summaries from Little Company of Mary Hospital dated August 27, 2004, and September 8, 2004;[2] (4) a request for leave under the FMLA dated August 8, 2004; and (5) a Certification of Health Care Provider form dated August 23, 2004, signed by Dr. Brisbin stating that the plaintiff was unable to perform all essential functions of her job and that

_____

[2]A diagnosis of "severe lumbar radiculopathy" appears on the September 8, 2004, discharge form, but the form is not signed by a doctor and there is no indication who provided the diagnosis or how it was determined.

the plaintiff has been "off work completely from June 21, 2004, and continuing until tests are completed" and that work status "to be addressed 8-23-04." The form does not indicate what Dr. Brisbin understood to be the essential functions of the plaintiff's job. The plaintiff submitted no other or updated medical information.

Hartford considered the September 24, 2004, letter to be an appeal from its denial of benefits and on November 8, 2004, denied the plaintiff's appeal and informed her of her right to pursue a civil action. The November 8, 2004, appeal denial states in part: "According to information in [sic] file, your job as a Desktop Specialist requires for you to sit most of the time[] with intermittent standing and walking; however, alternate sitting and standing is allowed as necessary. Limited lifting is also involved." Moreover, the letter states that "the information in file indicates that you have the ability to alternate sitting and standing as necessary, and that your employer allows lifting according to your abilities. While we understand that you could experience intermittent discomfort or pain due to your medical condition, the medical/clinical evidence does not support a functional impairment that would totally prevent you from performing the material and substantial duties of your regular occupation."

**B.     Summary Judgment Standard**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuinely disputed issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its

favor. *See, e.g., Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). A triable fact issue exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Schuster*, 327 F.3d at 573 *(quoting Wade v. Lerner New York, Inc.*, 243 F.3d 319, 321 (7 th Cir. 2001) (quotation omitted)).

The movant bears the initial burden of establishing that there is no genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims," the non-movant must then present specific facts showing that there is an issue for trial. *Michael v. St. Joseph County, et al.*, 259 F.3d 842, 845 (7th Cir. 2001) (*quoting* Fed.R.Civ.P. 56(e)). To successfully oppose the motion, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue. *Celotex*, 477 U.S. at 324. A scintilla of evidence in support of the non-movant's position is insufficient to defeat a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## C.    Analysis

### A.    Proper Party

The plaintiff initially named two defendants: Hartford and The Northern Trust Company Employee Benefit Administrative Committee. In its motion for summary judgment, the defendants claimed that the plaintiff sued the incorrect party. According to the defendants, the only proper party to a suit for benefits owed under the plan subject to ERISA is the plan itself. *Blickenstaff v. R.R. Donnelly & Sons Co. Short Term Disability Plan*, 378 F.3d 669, 674 (7th Cir.

2004).

The plaintiff then amended the complaint to include The Northern Trust Company Employee Welfare Benefit Plan as a defendant. The defendants continue to seek dismissal of the original two defendants. The plaintiff, however, argues that they are proper parties citing *Riordan v. Commonwealth Edison Commissioner*, 128 F.3d 549, 551 (7th Cir. 1997), and *Mein v. Carus Corp.*, 241 F.3d 581, 585 (7th Cir. 2001).

While the Seventh Circuit has stated that the plan is generally the proper party to sue when seeking benefits denied under the plan, *Blickenstaff*, 378 F.3d at 674, it has also indicated, as noted by the plaintiff, that non-plan defendants may be sued when the plan and the employer are closely intertwined. *Riordan*, 128 F.3d 549, 551 (7th Cir. 1997). Specifically, the *Riordan* court noted that the plan documents in that case referred to the employer and the plan "nearly interchangeably, and the company designated itself as the plan's agent for service of process." *Id*. The court notes, however, that the *Riordan* court did not rule on the issue of whether the corporation was a proper defendant because the corporation had not raised it before the district court.

In *Mein*, the other ERISA case cited by the plaintiff, the court addressed a claim that the corporation failed to pay benefits into the plaintiff's 401(k) account. 241 F.3d at 584-85. The plaintiff reluctantly added the plan as a defendant but continued to insist that the employer was the proper defendant. The court noted that "[t]he corporation and the plan are, if anything, even more closely intertwined in this case than in *Riordan*." *Id.* at 585. The *Mein* court noted that the summary plan description used the pronoun "we" and "our" to refer to the corporation, and not the plan. Further, like in *Riordan*, the designated legal agent for the plan was the corporation. In

addition, the plan trustee also appeared to be the vice-president of human resources for the corporation. The court concluded that despite the fact that the plaintiff insisted that the corporation was the proper defendant, because he had amended the complaint to add the plan, "and the close relationship between the plan and the corporation," the plaintiff had not plead himself out of court. *Id*.

Here, the plaintiff points out that the Northern Trust plan names the Employee Benefit Administrative Committee of Northern Trust as the plan administrator, the benefits payable are fully funded by Northern Trust, and the agent for service of process on the plan is "[a]ny attorney in the Legal Department of the Northern Trust Company at the above address." Based on these facts, the court finds that Northern Trust Administrative Committee is also properly named as a defendant.

The plaintiff also argues that Hartford, the claims administrator, is a proper defendant because "the connection between the insurer [i.e., Hartford] and the Plan were so intertwined, with the insurer making all decisions without reference to the plan (other than including a plan number), that the insurer, like the plan administrator, are [sic] proper parties to this claim." Plaintiff's Reply at 2. The court, however, does not find the connection between Hartford and Northern Trust to be the type of connection the Seventh Circuit was referring to when it deemed a plan and the corporation to be "closely intertwined." In essence, the Seventh Circuit was acknowledging that in some circumstances, the plan and the corporation are one and the same with only formalities creating any type of separation or distinction.

The same cannot be said of the plan and Hartford, which are wholly separate entities. Hartford likely acts as a claims administrator on behalf of numerous plans, not just the plan at

Page 11

issue here.  Thus, while acting on behalf of the defendant plan, Hartford remains a fully distinct

entity with no connections to the defendant plan.  Accordingly, Hartford is dismissed as a

defendant.  *Berg v. BCS Financial Corp.*, 372 F.Supp.2d 1080, 1089 (N.D. Ill. 2005)

("Accordingly, a plaintiff typically should not bring a claim under 502(a)(1)(B) against an

employer or a claims evaluator.") *(citing Blickenstaff v. R.R. Donnelley & Sons Co. Short Term

Disability Plan*, 378 F.3d 669, 674 (7th Cir. 2004) (a claim for benefits under Section

502(a)(1)(B) "generally is limited to a suit against the Plan, not an employer··· or claims

evaluator···"); *Moffat v. Unicare Health Ins. Co.*, 352 F.Supp.2d 873, 879 (N.D. Ill. 2005)

(recognizing that *Blickenstaff* 's language was not an express holding because the plaintiff had

waived any argument regarding proper defendants under Section 502(a)(1)(B), but further noting

that the same language supports the proposition that merely being active in deciding claims does

not transform an entity into a proper defendant).

    B.    <u>Standard of Review as to Denial of Benefits</u>

       The plaintiff asserts in her opening summary judgment brief that the proper standard of

review is de novo.  However, as noted by the defendants, in the plaintiff's combined response to

the defendants' motion for summary judgment/reply in support of her motion for summary

judgment, she argues her case only under the arbitrary and capricious standard of review.[3]

---

     [3]The plaintiff's argument that review should be de novo is not based on the language of
the plan but on the argument that a recent regulation by the then Illinois Department of Insurance,
which was passed on July 15, 2005, prohibits insurance companies from including in any
contracts offered in Illinois language purporting to reserve discretion in interpreting the contract
to the carrier.  *See* 29 Illinois Register 10172; Illinois Admin. Code, title 50,§ 2001.3.  However,
the court finds that this could not apply given that the regulation did not become effective until
July 2005, after the plan and service agreement were executed, eight months after Hartford
denied the appeal and six weeks after the plaintiff filed this lawsuit.  In any event, it appears that
the Illinois regulation would not apply to self-funded plans.  *FMC Corp. v. Holliday*, 498 U.S.

Generally, a court reviews the denial of benefits under an ERISA employee benefits plan de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Houston v. Provident Life & Accident Ins. Co.*, 390 F.3d 990, 995 (7th Cir. 2004) (citation and internal quotation marks omitted). If a plan confers discretion upon a plan administrator, then the court reviews the denial under an arbitrary and capricious standard of review. *Id.* Under that standard, the court will not overturn the plan's denial of benefits "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Id.* (citations internal quotation marks omitted).

Here, the language of the plan provides as follows (emphasis added):

3.2     Duties and Powers of the Plan Administrator

*The Plan Administrator will have such discretionary powers* as may be necessary to discharge its duties hereunder, including, but not limited to, the following:

(a)     *In its sole discretion, to construe and interpret the Plan and Participating Programs (including any ambiguities under the Plan and Participating Programs), decide all questions of eligibility and determine the amount, manner and time of payment of any benefits* under the Plan and Participating Programs.

Further, the plan states:

1.8     Claims Administrator

_____

52, 61 (1990) ("self-funded ERISA plans are exempt from state regulation insofar as that regulation 'relate[s] to' the plans").

"Claims Administrator" means, with respect to a Participating Program, the person(s) or entity(ies) appointed by the Company to serve as the claims administrator for such Participating Program. The Claims Administrator for insurance policies and HMO contracts will be the insurance company of HMO issuing the insurance policy or contract. The Claims Administrator for self-funding Participating Programs will be the Plan Administrator (or its delegate). To the extent such authority is delegated by the Plan Administrator, the Claims Administrator for a self-funded participating *Program will have the full discretionary authority to determine (i) eligibility for participation in a Participating Program, and (ii) benefits payable, if any, under a Participating Program.* The Claims Administrator will be a named fiduciary, with respect to the authority delegated to Claims Administrator, of the Plan.

Based on the language above, the court finds that the plan provided the administrator with discretionary authority to determine benefits.[4] Accordingly, the court will apply the arbitrary and capricious standard of review when reviewing the defendants' denial of the plaintiff's claim.

C.     Merits

A plan's decision to deny a claim is entitled to great deference under the arbitrary and capricious standard of review, and will be overturned only if it is "downright unreasonable." *Ruiz v. Continental Cas. Co.*, 400 F.3d 986, 991 (7th Cir. 2005).

On July 15, 2004, the MAT form sent to Hartford by Dr. Brisbin indicates that the plaintiff's "estimated return to work date" is "unknown until re-evaluated on August 9, 2004." Dr. Brisbin, however, then followed up the MAT form on July 21, 2004, with the results of an MRI examination and the plaintiff's treatment notes. As stated above, the treatment notes include a handwritten entry dated June 30, 2004, which states "per Dr. Brisbin, she should [have] position changes every 30 minutes and no lifting greater than 10 pounds."

---

[4]Indeed, in response to the defendants' statement of fact paragraph 8, the plaintiff admits that the two provisions laid out above "vest discretion to construe and interpret the Plan and decide all questions of eligibility for benefits in the Plan Administrator or its delegate."

Then, as part of her appeal letter, the plaintiff forwarded an undated[5] Certification of Health Care Provider form that is signed by Dr. Brisbin, on which the doctor wrote that the plaintiff is "unable to perform work of any kind as a computer operator," and that the plaintiff was unable to perform "all essential functions" of her work, at least until she was re-evaluated on August 23, 2004.

*The Parties' Arguments*

It is important to frame the parties' argument before proceeding to the analysis. The plaintiff argues that the denial of benefits was arbitrary and capricious because the plaintiff's doctor, the only physician to examine the plaintiff, opined that the plaintiff had two restrictions and that, assuming these two restrictions, the plaintiff was incapable of returning to or performing her job as desktop specialist.[6] On the other hand, the defendants contend that Hartford considered all of the medical and other evidence provided, and that contrary to Dr. Brisbin's conclusion, verified with the plaintiff's employer that the restrictions identified by Dr. Brisbin would not prevent the plaintiff from doing her job.

*The Plaintiff's Restrictions*

Given that both parties are accepting that the plaintiff has two restrictions, the court's analysis begins and ends with a discussion of the restrictions. According to the two restrictions stated by Dr. Brisbin: (1) the plaintiff should change positions every 30 minutes, and (2) the

_____

[5]The document appears to be signed at the very bottom by the plaintiff and the date next to the signature is August 23, 2004; however, Dr. Brisbin's signature is undated.

[6]Plaintiff's Reply at 4 ("[The] plaintiff primarily relies on the fact the Dr. Brisbin opined plaintiff could not lift more than ten pounds and should change positions every thirty minutes, and that these restrictions prevented her from performing the essential functions of her desktop specialist job.").

plaintiff should lift no greater than 10 pounds. While the plaintiff contends that Dr. Brisbin asserted that the plaintiff could not work under these two restrictions, the defendants concluded that she could.

A.    <u>Stand and Stretch Every Thirty Minutes</u>

As noted by the defendants, the plaintiff's supervisor reported to Hartford that a desktop specialist is able to stand and stretch when necessary. Indeed, the plaintiff herself acknowledged that while her job generally required her to be seated, she could stand and stretch as needed. The plaintiff argues that she could not merely stand and stretch, but needed to lie down and her job could not accommodate her lying down to stretch.

However, Dr. Brisbin's opinion does not state that she was required to lie down to stretch.[7] Moreover, the plaintiff asserts that "[t]here is an inherent difference in being able to stand and stretch, when necessary, and the ability to be able [sic] to perform a sitting job while standing." Plaintiff's Reply at 4. Again, however, Dr. Brisbin indicated only that the plaintiff change positions every 30 minutes, not that she remain standing at all times.[8]

---

[7]Indeed, the plaintiff herself argues later in her reply brief that "[i]f an independent medical examiner had reviewed Ms. Guerrero's medical records and opined that she should be able to perform a seated job, only with the ability to stand and stretch occasionally, the plan administrator's decision would not be arbitrary and capricious." Reply at 5. This argument significantly weakens, if not totally defeats, her contention that the only stretching that provided any relief was lying down and stretching.

[8]In a footnote, *see* Plaintiff's Resp. at 5 n.2, the plaintiff argues that "the need to change positions every 30 minutes could require the need to be able to stand, walk, sit, lie down, etc." The plaintiff, however, appears to be basing this argument on pure speculation and not on anything Dr. Brisbin indicated in her notes or opinions. Indeed, the plaintiff fails to point to anything in the record supporting this speculative statement.

The plaintiff asserts that had the defendants obtained a medical opinion[9] indicating that the plaintiff should be able to perform a seated job provided she could stand and stretch occasionally, then the plan's decision to deny the claim would not be arbitrary and capricious.[10] The court disagrees. Had Dr. Brisbin indicated on the one hand that the plaintiff could not perform her job and yet issued a contradictory opinion that the plaintiff could perform her job with the two restrictions listed, then the court would agree that the defendants should have obtained a clarification from Dr. Brisbin or another medical opinion.

But, according to the plaintiff, Dr. Brisbin's opinion indicated that the plaintiff needed to change positions every 30 minutes (and could lift only up to 10 pounds), and that she could not perform her job under these two restrictions. However, Hartford, accepting the restrictions as Dr. Brisbin did, concluded that the plaintiff could perform her job within these restrictions. The distinction admittedly is subtle. The court is not addressing a situation in which the plaintiff's doctor issued contradictory opinions and thus the defendant needed to reconcile competing conclusions from a doctor. Rather, both parties start from the same point – that the plaintiff had two restrictions. Each party, however, comes to different conclusions as to whether the plaintiff could work *given* these two restrictions.

Dr. Brisbin may have concluded that the plaintiff was unable to perform her job;

[9]Interestingly, in another portion of her brief, the plaintiff states that "Ms. Guerrero does not assert that The Hartford was required to obtain an independent medical examination." Reply at 8. Thus, it is unclear whether the plaintiff is arguing that the defendants were required to obtain another medical opinion.

[10]The defendants, however, did attempt to obtain clarification from Dr. Brisbin as to the nature of the plaintiff's restrictions and the basis for her conclusion that the plaintiff could not work in light of those restrictions. However, the defendants state that Dr. Brisbin failed to respond to their requests with information that supported her conclusion.

however, the plaintiff has failed to point to any record evidence that Dr. Brisbin was aware of the specific duties required of a desktop specialist, other than that it was primarily a sedentary position. The defendants, after performing research within the company, concluded that the plaintiff was able to perform the duties of her position even with the restrictions listed. This was not arbitrary and capricious.

### B. Lifting Less Than Ten Pounds

Further, as to the ten-pound lifting restriction, the defendants point to the statement by her supervisor acknowledging that the position of desktop supervisor required lifting print jobs which sometimes consisted of thousands of pages. However, the supervisor indicated that there were no requirements that the plaintiff lift any particular weight and that she would be allowed to lift paper as she was able.

The plaintiff argues that the supervisor's testimony was inaccurate because the plaintiff stated that she sometimes had to lift reams of paper and sometimes had to lift as much as 70 pounds. However, this is not contradictory. The supervisor acknowledged that the plaintiff might be required to lift significant weight, but stated that the plaintiff could do so as she was able (i.e., "little by little"). The supervisor's statements are not necessarily contrary to the plaintiff's as to the amount of weight the plaintiff was required to lift as part of her job.

For this same reason, the case cited by the plaintiff, *Marchetti v. Sun Life Assurance Co. of Canada*, 30 F. Supp. 2d 1001 (M.D. Tenn. 1998), is distinguishable. In *Marchetti*, the court found that the plan had acted arbitrarily and capriciously when it denied the claimant's request for disability benefits. Specifically, the plaintiff's treating physician had diagnosed the claimant with rheumatoid disease and that he could not lift and/or carry more than five pounds. Id. at

1005. The claimant asserted that his job required him to do "heavy-duty" work including lifting

heavy parts (the defendant admitted that some parts weighed more than 90 pounds), and rolling

large cable, as well as assisting in troubleshooting difficult pieces of equipment. The employer

stated that these duties, however were outside the scope of the claimant's regular duties and were

not material to his job. *Id*. at 1006.

The *Marchetti* court pointed out that even the employer's job description stated that the

claimant was required to lift 10-15 pounds and in its claim statement to the claims administrator,

the employer stated that the claimant had to occasionally lift and carry up to 50 pounds. *Id*.

The court concluded that the defendants "failed to articulate adequate grounds for

discounting the opinions of Plaintiff's examining and treating physician." *Id*. at 1009. Here,

however, the defendants did not discount Dr. Brisbin's limitations but accepted them. Moreover,

the *Marchetti* court noted that the defendants discounted, without a proper basis, evidence of the

plaintiff's job duties as stated by the plaintiff, his co-workers, and his customers. *Id*. at 1009-

1010. Here, however, as already noted, the plaintiff's description of her job did not necessarily

render her incapable of performing the duties given the supervisor's statement that she could

stand and stretch as needed and could lift papers and other things "little by little." Moreover, in

*Marchetti*, the defendants failed to interview the claimant's supervisor, which is not the case

here. Thus, the court does not find *Marchetti* to be on point.

### The Plaintiff's Remaining Arguments

The plaintiff contends that although the plan allowed Hartford to have the plaintiff

examined by their own medical specialist, it failed to request such an examination, and that in the

absence of any contradictory medical opinion, the plaintiff's doctor's opinion should prevail.

However, "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians." *Kobs v. United Wisconsin Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005). Moreover, the defendants *accepted* the restrictions as provided by the plaintiff's doctor and determined based on interviews with the plaintiff's supervisor that the plaintiff was able to perform her job even in light of those restrictions. *Brigham v. Sun Life of Canada*, 317 F.3d 72, 85 (1st Cir. 2003) (concluding that because the plan accepted the limitations identified by the claimant's physician and adopted that physician's earlier determination that the limitations did not prevent the claimant from working, the plan "had no obligation to obtain its own medical evidence.").

The plaintiff asserts that *Brigham* is inapposite because she is not arguing that the plan administrator's decision was arbitrary and capricious because the defendants did not obtain an independent medical opinion. Rather, she states that the defendants were required to consult a "health care professional who has appropriate training and experience in the relevant field of medicine." The plan states that in deciding an appeal, for any adverse benefit determination that is based "in whole or in part on a medical judgment, the Appeals Administrator will consult with a health care professional . . . who has appropriate training and experience in the field of medicine involved in the medical judgment."

But here, the court agrees with the defendants that the denial of benefits was not based on a medical judgment, as they accepted the doctor's restrictions. Rather, the defendants concluded that based on the medical evidence provided, the plaintiff could do her job. With respect to the plaintiff's reference to the procedures on appeal, the court notes that on appeal, the plaintiff failed to include any additional information from Dr. Brisbin that she was unable to work. The

note and Certification of Health Care Provider signed by Dr. Brisbin and provided by the plaintiff on appeal both indicated that the plaintiff could not return to work until she was re-evaluated on August 23, 2004 (the date of the denial of benefits). However, the plaintiff's appeal letter was dated September 24, 2004, and includes no updated information from the doctor as to what occurred at the "re-evaluation" on August 23, 2004.

Finally, to the extent that the plaintiff argues that the defendants should have contacted her instead of trying to obtain clarification from Dr. Brisbin, the court rejects this argument as not supported by the regulation cited, 29 C.F.R. § 2560.503-1(f)(3) (describing time by which plan should notify claimant of adverse benefit determination and requirements for notification of extensions).

The court finds that the record does not support Dr. Brisbin's conclusion that the plaintiff could not perform the essential functions of her job because she had to change positions every 30 minutes and could not lift more than ten pounds. The plan requires a claimant to have an impairment that "totally prevents" her from doing her job. Dr. Brisbin provided her medical opinion that the plaintiff had two restrictions in her work, and that the plaintiff could not work with these restrictions. The defendants concluded to the contrary, however, based on communications with the plaintiff, her supervisor, and her doctor. The court does not find this conclusion to be "completely unreasonable."

**D.**     **Conclusion**

For the reasons specified above, the defendants' motions for summary judgment [23-1, 37-1] are granted and the plaintiff's motion [22-1] is denied.  Hartford is dismissed as a defendant.  The case is terminated.

**ENTER:**

_Blanche M. Manning_
**Blanche M. Manning**
**United States District Judge**

**DATE:** April 26, 2006